UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LUIS ALONSO AGUILAR, ET AL            CIVIL ACTION

VERSUS                                NO. 07-5652

BOLLINGER SHIPYARDS, INC., ET AL      SECTION"C"

<u>OPINION</u>

Liability issues in this matter was tried before the Court without a jury on

April 11-13, 2011.   Having considered the testimony, the evidence adduced at trial,

the record and the law, the Court now finds in favor of the defendants on the issue

of liability for the following reasons.

**Background**

The plaintiff, Luis Alonso Aguilar ("Aguilar") is suing the defendants,

Bollinger Shipyards, Inc. ("Bollinger") and Blessey Marine Service, Inc.

("Blessey") for personal injuries sustained on March 30, 2007,  when he was

working for Karl Senner, Inc. ("Senner") as a service technician on board the M/V

DREAMA KLAIBER, a vessel owned and operated by Blessey.   At all material

times, the vessel was at the Bollinger Quick Repair shipyard located on the Harvey

1

Canal in Harvey, Louisiana undergoing repairs.

Aguilar was working alongside two Senner employees, Marlon Ferez ("Ferez"), service technician for Senner and lead sevice technician on this job, and Bradley Johnson ("Johnson"), a Senner helper.   Senner had been contacted by Blessey to repair the Reintjes gears on the vessel because Senner is the exclusive North American repair representative for Reintjes.   The three Senner workers were in the process of reinstalling certain repaired gears in the starboard side of the engine room when the plaintiff was struck in the lower back by a falling I-beam that had been positioned above the engine room as a lifting point for the chain hoist and chains used to move the equipment into place.   Aguilar sues Blessey as vessel owner under of the Longshore and Harborworkers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), and sues Bollinger under general maritime law for negligence; the claims were designated under Fed. R. Civ. P. 9(h) in amended complaint.[1]   Aguilar's wife also filed a claim for loss of consortium.

**Facts**

---

[1]Despite Bollinger's more recent requests for a jury trial, the plaintiffs' motion to strike the jury demand made by Bollinger in its answer was granted by the Court as unopposed by Bollinger and as having merit in May, 2008.   Rec. Doc. 32.

The details provided by all the lay witness testimony varies little in significant respect from that provided by Ferez, the lead Senner technician on this job.   Both Ferez and Aguilar were experienced Senner service technicians.   Ferez testified that he worked with Blessey about 20 times a year during his employment with Senner, and with Blessey's port engineer,  Edward Jones ("Jones"),  between 10-15 of those times.   He testified that Jones exercised supervision or control over his work insofar as he ensured that the job is promptly done and the work was correctly completed.  Rec. Doc 306 at 8.  Although Senner provided tools, chain hoists and chain falls, Ferez testified that they were able to request other items they needed from Blessey when working on a Blessey vessel.   Rec. Doc. 306 at 9.

On March 20, 2007, Ferez arrived on the M/V DREAMA KLAIBER in dry dock with its stacks removed, inspected the engines and reported to Jones that the gears needed repair because of damage to clutch parts.  Jones approved the repair, and Ferez and Johnson began disassembly to remove only those parts needing repair.   The gearbox and its parts are quite heavy, and required disassembly in order to remove the parts needing repair.   Ferez testified that they normally attach their chain fall to padeyes or lifting points in the structure of the vessels to manuever the gears and its parts during disassembly and reassembly.   Rec. Doc.

3

306 at 14.  Ferez testified that because a suitable padeye was not available on this vessel and using a chain was "unsafe," Ferez requested from Jones "something like an A frame or a strong piece so we can put it across so we can have a lifting point." Rec. Doc. 306 at 16.  Jones returned "with a big I-beam" delivered by crane to the vessel.  Ferez testified that maybe 4-6 men from Blessey and Bollinger assisted in shoving the beam, "[a]nd I told them, you know, move it a little bit and they jam it on top of the gearbox" on the starboard side above the engine room.[2]  Rec. Doc. 306 at 17.  After successful disassembly on the starboard side, Ferez asked the same men to move the beam to the port side, completed another disassembly without incident, and left the vessel with the necessary parts for in-shop repair.

According to Ferez, the same beam and chain fall was used to reassemble the gears on March 30, 2007, after repair.  Ferez began on the port side because the beam was already in place there, and reassembled without incident.  Ferez recalled that Aguilar arrived in the afternoon at a time when Ferez was almost done with the port side and he had requested help from the same men who previously helped him move the beam.  Ferez testified that he was involved in moving the beam.  Rec.

---

[2]For present purposes, the Court finds that both Ferez and Aguilar could discern by whom workers were employed by their clothes and/or identification tags.

Doc. 306 at 41.  After the beam was placed, Ferez testified that they hung chain falls on it and that he and Aguilar began hoisting pinions for reassembly using the chain fall coordinated with each other.  During the second lift, the accident occurred.

Ferez testified that at no time prior to the accident did Ferez anticipate any problem with using the beam as a lifting point.  He testified that the beam could have been welded or drilled and bolted into place "to have it 100 percent secure."  Rec. Doc. 30 at 34.   He testified that no one from Blessey or Bollinger gave him instructions to do anything with regard to the beam, and that he did not recall ever using an I-beam as a lifting point before.   Rec. Doc. 306 at 34-35.

On cross-examination, however, Ferez testified that he was the Senner employee in charge of the gearbox and gave instructions to Aguilar and Johnson.  At first, Ferez admitted that he made decisions as to how to rig the manuever "in part," while admitting that he made the decision how to attach the chain fall.  Rec. Doc. 306 at 39.  Ferez also testified that at some point he asked Jones if they could get something else, but that he never objected to the placement or use of the I-beam as a lifting point.  Rec. Doc. 306 at 40.

Ferez candidly stated on cross-examination that he was "100 percent

5

satisfied with the beam and its placement and its securing before [Ferez] and Mr. Aguilar began lifting that gear ..." Rec. Doc. 306 at 41. He agreed that he was "the one who decided exactly where to place the beam, that is how to position it, where to angle it, how to position it, [he was] the one who decided where to place it in order to accomplish the lift that [he] wanted to make ..." Rec. Doc. 306 at 41-42. He estimated that Senner employees made about 18-19 safe lifts using the beam prior to the accident and agreed that he was "personally satisfied" that the operation was safe. Rec. Doc. 306 at 48. He evaluated the options and determined which lifting point to use. Rec. Doc. 306 at 55-57. Ferez recognized that he had the responsibility as lead member to stop work on the gear replacement job if he saw anything dangerous. Rec. Doc. 306 at 58-60. He testified that he did not think he needed a welder to secure the beam and never asked anyone else to inspect the security of the chain fall on the last lift. Rec. Doc. 306 at 62.

Ferez admitted that he and Aguilar were partially at fault in causing the accident because their pulls were not coordinated correctly, but denied that he knew they could move the beam enough for it to fall. Rec. Doc. 306 at 50. At no time did Ferez think that it was unsafe to have the beam above them while they were working. Rec. Doc. 306 at 90.

6

For the most part, the testimony of Aguilar echoed that of Ferez with regard to the issue of liability.  Aguilar had been a service technician since 1996.  He arrived on the vessel on the date of the accident as Ferez and Johnson were finishing the reinstallation of the port side gears.  He testified that he assisted Ferez, Johnson, and some Blessey and Bollinger employees move the beam across the walkway to the starboard side.  He and Ferez had one successful lift using the beam and chain fall.  The accident occurred during the second lift.   He testified that Andrew Norval ("Norval"), safety manager for Blessey had been in the engine room earlier before the accident.

On cross-examination, Aguilar denied that Senner ever provided its own lifting points for jobs on vessels, although he agreed that Senner did provide employees with their own tools and lifting gear.  Rec. Doc. 307 at 73.  Aguilar testified that he did not expect other people to tell him how to safely do his job with regard to anything concerning the gearbox.  Rec. Doc. 307 at 74.   He testified that he relied on Ferez, that he felt that the beam was securely placed on the starboard side, that he did not think the beam would fall because it had been successfully used on the port side and that he was personally satisfied with the way it was secured.  Rec. Doc. 307 at 79-80.  Aguilar testified that they thought the

angle of the chain fall involved in the rigging was correct and did not see anything

wrong with it, and that he and Ferez knew to coordinate their movements with each

other when moving the pinion.  Rec. Doc. 307 at 81-82.

Aguilar also testified that he did not remember Ferez's previous testimony

that they were partially at fault in causing the accident, and in answer to the

question whether the manner in which he and Ferez operated chain fall contributed

to the accident, testified "Maybe.  I don't know.  I'm not sure, sir."  Rec. Doc. 307

at 85.  Aguilar failed to recall his deposition testimony that Ferez had discussed the

need to have the beam tack welded for safety purposes, and stated that he did not

think the use of the beam was unsafe.  Rec. Doc. 307 at 93-96.    He did recall,

however, that during the last lift, there was something to stop the beam from

sliding toward the outboard side, but nothing on the inboard side to prevent the

beam from sliding, and that they were pulling the beam to the inboard direction

when the beam fell.  Rec. Doc. 307 at 98-99.

The testimony of all other lay witnesses add to the inevitable finding that

Senner alone was responsible for the safety of the lift.   Michael Senner with

Senner testified that he does not expect Blessey to supervise and inspect Senner's

work as it is being done or for Bollinger to instruct or direct Senner workers.  Rec.

8

Doc. 308 at 10, 12-13.  He testified that before  Senner employees go out on a job,

they have been exposed to a lot of lifting, and"they have to be very good at it and

they have to be very safe doing it."   Rec. Doc. 308 at 16.   He testified that he did

not expect either Blessey or Bollinger to ensure a safe lifting point was provided to

Senner workers and would not necessarily expect Blessey or Bollinger employees

to look for unsafe conditions and advise Senner workers.  Rec. Doc. 308 at 19-20.

He confirmed that Senner service technicians were in the best position to determine

if the beam was safe for the lift, not Blessey or Bollinger workers.  Rec. Doc. 308

at 21.

David Haeuser ("Haeuser"), Senner's service manager at all material times,

had been with Senner for over 30 years at the time of the accident.  Rec. Doc. 308

at 26.  After receiving a call from Jones, Haeuser assigned this job to Ferez.  He

confirmed that Senner does not supply its service technicians with lifting points,

and that the mechanics, not the vessel owners, are expected to plan the rigging on

each job.  Rec. Doc. 308 at 41.  Haeuser also testified that he had no problem with

using an I-beam as a lifting point on a job, but that Senner mechanics would be

responsible to ensure the I-beam was secured.    Rec. Doc. 308 at 43.  The I-beam

could be secured by welding, c-clamped or chained.  Rec. Doc. 308 at 49.

Haeuser testified that I-beams had been used as lifting points before, but it was not a common use.   Rec. Doc. 306 at 51.

Because almost all of Blessey's fleet had Reintjes parts, Jones testified he had worked with Senner for approximately 11 to 12 years prior to the date of the accident.  Rec. Doc. 306 at 130.  Blessey's contract with Bollinger for this vessel was a "time and materials" contract.  Rec. Doc. 306 at 132-133.   Jones testified that Blessey does not have an overseer to coordinate safety among the various workers on board a vessel in the shipyard, and that Blessey depends on the contractors do their jobs safely.  Rec. Doc. 306 at 94.   He denied that he was charged with overseeing the work of the Senner employees while they were on the vessel, but that he was in charge of the job and "[i]f Karl Senner needed help, I was to get with Bollinger and get them the assistance that they needed."   Rec. Doc. 306 at 102-04.

Jones testified that Ferez first asked Jones for a pipe to use as a lifting point, Jones told him a beam would probably be better than a pipe and Ferez agreed. Rec. Doc. 306 at 106.   Jones testified that he offered Ferez a welder for the beam, and that Ferez declined because the beam was going to be moved several times, at which time Jones told Ferez that if he needed a welder, Jones would arrange for

one to be provided.   Rec. Doc. 306 at 114-19.  Jones testified that he did not

supervise Senner's work at any time, did not observe the Senner employees use the

I-beam and did not recall another occasion on which Senner used an I-beam.   Rec.

Doc. 306 at 129-30, 132.

Norval testified that he has worked in Blessey's safety department for about

seven years, and was safety manager on the vessel on the date of the accident.  He

testified to responsibility for shipboard operations involving crew, but does not

have responsibility over the security of lifting points on the vessel and the crew

does not use lifting points.   Rec. Doc. 307 at 5-7.   He specifically testified that

Blessey has no responsibility to make sure lifting points provided by Blessey

personnel are safe and secure.  Rec. Doc. 306 at 7.

Norval testified that he was on the vessel on the date of the accident to do

some safety training of the captain and deckhand along with a follow-up safety

audit.   Rec. Doc. 307 at 26.  Norval testified that he went into the engine room to

release a brake when he saw the three Senner employees in the engine room on the

date of the accident, but did not do any type of audit of their activity or regard for

unsafe conditions as it was not his purpose.  Rec. Doc. 307 at 8-10, 15, 28.  After

Norval left the vessel, the accident occurred and he was called back.  Rec. Doc.

307 at 12.

Norval testified that prior to the accident, he did not know if the I-beam used by Senner was welded or not.  Rec. Doc. 307 at 36.   He admitted that the vessel captain and he could have ordered the beam welded, but that at the time he did not know that an I-beam that is not welded down is unsafe, and that Blessey relies on the mechanics and shipyard to do their jobs professionally and safely.    Rec. Doc. 307 at 16-17, 20, 24.  Norval also admitted that Blessey does not coordinate the safety among all the workers on board the vessel when in the shipyard, and that Blessey had a regulatory compliance officer.  Rec. Doc. 307 at 24, 32.   Instead, Norval testified that it is not part of his job to inspect or check the operations of independent contractors on the vessel and that Blessey considered Senner to be responsible for the safety of its operations.  Rec. Doc. 307 at 25, 33.

Bollinger's facility safety coordinator for Bollinger Quick Repair, Douglas Comeaux ("Comeaux"), testified that the shipyard was a multi-employer workplace, but that his responsibilities were to his employees and that he would have had no involvement with the placement of the I-beam.   Rec. Doc. 307 at 48, 50, 52, 54.  He agreed that there should be communication and coordination between host and contract employers, and that the host is generally in the best

position to ensure the communication and coordination.  Rec. Doc. 307 at 55-56.

Comeaux also testified that a Job Safety Analysis ("JSA") at 4:00 p.m. at shift

change occurred just before the accident at which Bollinger employees and

contractors participated.  Rec. Doc. 307 at 59-61, 65.

The expert in marine engineering, naval architecture and marine safety

retained by the plaintiff, Edward Geoffrey Webster("Webster")  testified to the

opinion that when Senner realized they wanted a lifting point over the top of the

gearboxes to drop the pinions in, Senner, Blessey and Bollinger should have had a

JSA or joint meeting to "a least discuss whose job is what and how it was going to

be performed and whether it would be safe, whether the beam should be welded in

place and how it should be secured."[3]   Rec. Doc. 307 at 123.   He testified that

Bollinger Quick Repair Yard is a multi-employer workplace according to OSHA

regulations.  Rec. Doc. 307 at 123-24.   He added the opinion that Blessey should

have made sure the beam was correctly secured, Jones should have checked the

_____

[3]It is undisputed that other than the meeting between Jones and Ferez
wherein Ferez declined the offer of a welder, there was no meeting among Senner,
Blessey and Bollinger personnel to discuss any issue including safety or the beam.
After the accident, a meeting to discuss the accident was convened with
Senner, Blessey and Bollinger personnel that included Haeuser, Norval, Comeaux
and others  Rec. Doc. 307 at 19, 57; Rec. Doc. 308 at 47.  After that meeting, the I-
beam was welded into place.  Rec. Doc. 307 at 20.

safety of the Senner employees when he was in the engine room, and that Norval

should have stopped Senner's work even though he did not know how the beam

was secured.   Rec. Doc. 307 at 128, 131, 132   His final opinion was that safety

marine managers have an obligation to ensure the safety of everyone working

around their employees, and that OSHA requires a competent person to ensure that

the workplace is safe.  Rec. Doc. 307 at 160-61.

On cross examination, Webster testified that the Senner service technicians

such as the plaintiff should have known how to properly operate a chain fall and

secure a lifting point, should have known that welding the beam is appropriate and

should not have begun lifting without safeguards in place.   Rec. Doc. 307 132-34,

141.  Webster also testified that Senner should have conducted a JSA, Aguilar

should have ensured that it did, and Johnson should have been assigned the task of

watching the beam by a service technician.  Rec. Doc. 307 at 135-36, 139, 144.

He agreed that had Aguilar ensured the I-beam was properly used, the accident

would not have happened.  Rec. Doc. 307 at 145.

With regard to the distinct issue whether the vessel had lost its vessel status,

both Allen Stein ("Stein"), general manager of Bollinger Quick Repair, testified

that the Bollinger drydock used had not been moved for over at least 22 years.

14

Rec. Doc. 308 at 55.  Both Stein and Jones testified that the M/V DREAMA

KLAIBER was in dry dock an estimated 25% of the month it was in the shipyard

and in the water 75 % of the time.  Rec. Doc. 306 at 99-102;  Rec. Doc. 308 at 60-

61.  Jones testified that the vessel had been in and out of dry dock twice during

repairs.  Rec. Doc. 306 at 100. The parties stipulated that the vessel was on the dry

dock at the exact time of the accident, as did Comeaux.  Rec. Doc. 307 at 61, 64,

111.  Parts of the vessel had been removed and dismantled during repairs at the

time of the accident; certainly, the vessel was not capable of navigation using its

engines at the time of the accident.

 As can be seen, little disagreement among the laywitnesses called to testify

as to the underlying facts.   In addition to the uncontested facts established by the

testimony, and with regard to the contested issues surrounding liability, the Court

finds the following facts based on a preponderance of the evidence:

1. The M/V DREAMA KLAIBER remained a vessel at all material times   It

was not undergoing a major overhaul at all material times.   The repairs were minor

and its removal from maritime commerce was temporary and brief.

2. All representatives of Senner, Blessey and Bollinger involved in the repairs

on the M/V DREAMA KLAIBER understood that Senner, and specifically Ferez,

was solely responsible for the execution and safety of Senner's work on the vessel, including all safety issues attendant to the use of the I-beam as a lifting point.

3.      Ferez exercised his authority over the manner in which the I-beam was used at all material times.  He discontinued any unsafe practice involved in Senner's work on the vessel when he deemed it necessary, as evidenced by his decision not to use the padeyes available on the vessel and a chain as the lifting point.

4.      On the first day the I-beam was provided, Jones met with Ferez and asked whether Ferez needed a welder and Ferez declined because the I-beam was going to be moved during the Senner operations on board.

5.      Despite having asked the team of movers to jam the I-beam into place on the starboard side when Ferez first used it on March 20, 2007, no testimony was presented that Ferez repeated the instruction or otherwise insured that the I-beam was immobile on the date of the accident.

6.      At no time did any person who testified, including Ferez and Aguilar, believe that the use of the I-beam as a lifting point was unsafe.

7.      The I-beam could be used in a safe manner as a lifting point without being welded into place and was used in a safe manner without being welded into place.

8.      The accident occurred after the I-beam moved due to lateral forces on it

16

attendant to the movement of the chain fall being used by Ferez and Aguilar.

9.     No representative of Blessey or Bollinger knew or should have known that Ferez and Aguilar were using the I-beam in a dangerous manner that would have caused the accident.


**Law**

The Court finds that it has subject matter jurisdiction under § 905(b).[4] Specifically, it finds that the M/V DREAMA KLAIBER was a vessel for all purposes, including 33 U.S.C. § 905(b).  The repairs at the shipyard took approximately one month to complete, the vessel was in water 75% of that time, and the repairs were not part of a major overhaul for purposes of the rule set forth in *Chandris, Inc. v. Latsis*, 515 U.S. 347, 374 (1995).   The mere fact that the vessel was on drydock at the moment the accident occurred is not determinative. Instead, the Court concludes that the vessel was undergoing only minor repairs, not a major overhaul, thereby remaining in navigation at all relevant times.  *Id.  See also Stewart v. Dutra Contsruction Co.*, 543 U.S. 481 (2005).  The argument

_____

[4]Although the accident took place on a vessel on dry dock, even if the general maritime law did not apply, any state law claim against Bollinger would fall within the Court's pendent jurisdiction.

presented by Bollinger that the vessel may not have been capable of navigation at the time of the accident may prove too much.[5]   It suggests that any routine repair to the engines or other major part of the vessel that temporarily prevents the vessel from navigating as it did before repairs commenced causes the vessel to lose vessel status for § 905(b) purposes.   Under that theory, a vessel's status would change from moment to moment while undergoing repairs under § 905(b), directly contrary to *Chandris* and *Stewart*.

In general, § 905(b) and *Scindia* allow for claims of negligence against vessel owners.  The duties set forth in *Scindia* apply to any independent contractor and its employees covered by the LHWCA.   *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982).  To be a legal cause of Aguilar's injury, the plaintiffs must prove the breach to be a substantial factor in the injury.  *Moore v. M/V ANGELA,* 353 F.3d 376, 383 (5th Cir. 2003).  Prior to trial, the plaintiffs articulated two § 905(b) claims against Blessey as vessel owner under *Scindia Steam Navigation Co., Ltd. v. de Los Santos*, 451 U.S. 156 (1981): the duty to intervene

---

[5]Bollinger's reliance on Stein's testimony for the proposition that the vessel would have sunk if placed in water at the time of the accident is unpersuasive.  The Court notes that at no time did Stein testify that the hole in the hold was or was not covered after the shafts were removed at the time of the accident.   Rec. Doc. 308 at 61-62; Rec. Doc. 313 at 8.

and the active control/active involvement duty; no mention is made of a claim for breach of the turnover duty.   Rec. Doc. 262 at 2-3; Rec. Doc. 265 at 265.   In their post-trial memorandum, however, the plaintiffs seem to have extrapolated on those claims by arguing that all three *Scindia* duties require actual knowledge of the dangerous condition on the part of the shipowner and that "[e]ach of the *Scindia* duties is triggered as to Blessey."  Rec. Doc. 314 at 8.   The plaintiffs' description of the claims against Blessey is again redefined in post-trial reply memorandum, along with their description of constructive knowledge.  Rec. Doc. 317.  Because of its difficulty with ascertaining the nature of the exact claims being made here, the Court will address all three duties imposed on the shipowner under *Scindia* as interpreted by the Fifth Circuit to determine whether the plaintiffs have met their burden of proof as to any claim.[6]

The first duty owed by a shipowner under *Scindia* is the "turnover duty." This duty focuses on the shipowner's obligation before or at the commencement of the repairman's operations.  *Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 98

---

[6]The Court finds no merit in the apparent claim that the shipowner may have wanted repairs to be performed expeditiously, which allegedly caused the accident. The proof establishes that the bulk of the time repairing the gearbox took place in the shop, not on the ship, and the time it took to weld the I-beam would have been relatively minimal.

(1994); *Kirksey v. Tonhai Maritime,* 535 F.3d 388, 392 (5th Cir. 2008).   It requires the shipowner to exercise ordinary care under the circumstances to turn over the ship and equipment in such condition that an expert repairman, "mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ships service or otherwise," will be able by the exercise of ordinary care to carry on operations with reasonable safety" to persons and property. *Howlett*, 512 U.S. at 98. It also requires the shipowner to warn the repairman of latent or hidden dangers which are known to the vessel owner or should have been known to it, excluding "dangers which are either (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering. *Id.; Kirksey,* 535 F.3d at 392.

The Court concludes that no evidence exists to support a finding that Blessey violated any obligation pertaining to the turnover duty.   Instead, Blessey relied on Senner's employees performing the work with reasonable care. *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982). Any danger posed by the use of the I-beam, which was provided several days before the accident, is one which a reasonably competent worker such as Ferez or Aguilar should anticipate encountering; in fact, the evidence establishes that Ferez ensured that the I-beam

was wedged into place when he used it in the same location just days before.

The second duty owed by Blessey under *Scindia,* the "active control duty,"
applies once operations have begun.   *Howlett,* 512 U.S. at 98.   "It is also accepted
that the vessel may be liable if it actively involves itself in the cargo operations and
negligently injures a longshoreman or if it fails to exercise due care to avoid
exposing longshoremen to harm from hazards they may encounter in areas, or from
equipment, under the active control of the vessel during stevedoring operation."
*Scindia*, 451 at 167.  This duty requires that a shipowner "must exercise reasonable
care to prevent injuries to [workers] in areas that remain under the 'active control
of the vessel.'" *Clay v. Daiichi Shipping*, 74 F.Supp2d 665, 673 (E.D.La. 1999),
*aff'd* 237 F.3d 631 (5th Cir. 2000).   A prerequisite for vessel liability for breach of
the active control duty is "actual control by the vessel over the actual methods and
operative details" of the repairman's work.  *Id.*  Mere presence of vessel personnel
on the vessel at the time of the accident is insufficient in the absence of evidence
that the reassembly was in any way under the active control of the ship.  *Id.*

The plaintiffs' claim for breach of the actual control duty also fails for lack
of  proof.   Although Blessey certainly remained the vessel owner at all relevant
times, there is no evidence that it actively participated in Senner's repair operations

or maintained any control over the performance of that work, including the method of dismantling and reassembly.   Instead, all involved at the shipyard knew that Senner was in control of its own operations and the decision how to use the unwelded I-beam as a lifting point.   In addition, Senner exercised its right of control over its operations by choosing not to weld the I-beam into place prior to the accident.   The Court finds that no Blessey employee, including Jones and Norval, exercised the requisite "active control "over the actual methods and operative details" of  Senner work by arranging for the I-beam, offering a welder, or being in the same area as Senner workers, nor did Blessey otherwise "assume the role" of a Senner worker.   *Clay*, 74 F.Supp.2d at 673.

Finally, a shipowner has a "duty to intervene" because it had "actual knowledge both of the hazardous condition and that the [repairman], in the exercise of obviously improvident judgment, intends to continue to work in spite of that condition." *Gay v. Barge 266*, 915 F.2d 1007, 1012 (5th Cir. 1990).   This is a narrow duty that "requires something more than mere shipowner knowledge of a dangerous condition."  *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996).  "Obviously improvident judgment" on the part of Senner personnel requires a showing that they "must use an object with a defective

22

condition or follow a procedure that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when [Senner's] expertise is taken into account."   *Clay*, 74 F.Supp2d at 674.

Any claim for breach of the duty to intervene also fails for insufficient proof. Whether the hazard was posed by the shifting of the I-beam due to lateral forces involved with the use of the chain fall by Ferez and Aguilar, the fact that the I-beam was not welded, or any other circumstance involving the use of the I-beam on the date of the accident, the plaintiffs' proof is insufficient to establish a claim for violation of this duty.  Again, Ferez declined Jones' offer of a welder, the I-beam could and had been successfully secured without welding, and the I-beam used was successful for nearly 20 lifts.  There is no credible proof either that Blessey had actual knowledge of any hazardous condition posed by the use of the I-beam as a lifting point or allowed continued work with the prerequisite knowledge that the Senner workers, in the exercise of obviously improvident judgment, intended to continue to work in spite of that condition.  Instead, the evidence establishes that Blessey acted with reasonable care at all times.

To the extent that the plaintiffs argue that *Scindia* recognizes a shipowner duty to supervise Senner's work and inspect the area assigned to it, the Court

23

disagrees.   The Fifth Circuit does recognize that a shipowner can have the knowledge of a danger that would trigger the duty to intervene if it has actual knowledge or if the danger existed at the outset, in which case the shipowner is deemed to have the requisite knowledge.   *Hill*, 674 F.2d at 451.   That is not the situation here.   "We are of the view that absent contract provision, positive law, or custom to the contrary - none of which has been cited to us in this case - the shipowner has no general duty to by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore."  *Scindia*, 451 U.S. at 172.  *See also Howlett*, 512 U.S. at 101-02.   "The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.  *Scindia*, 451 U.S. at 172.   The rule is the "general absence of a duty of the shipowner to protect" employees such as Aguilar; the exception is articulated in the third *Scindia* duty.   *Hill*, 674 F.2d at 451.   "[O]nce the stevedore begins its operations, the shipowner has no general duty to supervise work or to inspect the area assigned to the stevedore, unless custom contract or law imposes such a duty on the shipowner."   *Hill*, 674 F.2d at 451.   "The shipowner need not monitor the

24

stevedore's operations; rather, the shipowner is entitled to rely on the stevedore's expertise and reasonableness." *Hill,* 674 F.2d at 451.  There is a "justifiable expectation" that the workers would "perform with reasonable competence and see to the safety of the [] operations."  *Howlett*, 512 U.S. at 101.

The exact nature of the plaintiffs' claims against Bollinger was unclear to the Court from the pleadings and memoranda.  The Court asked counsel for the plaintiff for clarification at trial.   Counsel advised that their claim against Bollinger was for breach of the duty as a multi-employer host to convene a safety meeting with Senner, Blessey and Bollinger once Bollinger agreed to provide Senner with the I-beam.   Counsel also stated that Bollinger should have taken the steps to ensure that the I-beam was welded.    Whether these claims are governed by the general maritime law or Louisiana law, the Court finds these claims fail for a number of reasons.

First, the plaintiffs have previously admitted that the OSHA regulations regarding multi-employer work forces do not apply here to either defendant.   Rec. Docs. 75, 76, 91, 268, 296. "While they are evidence of a general standard of care due employees, they establish no standard of care due third persons." *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 707 (5th Cir. 1981).  The plaintiffs

acknowledge that this is the rule in the Fifth Circuit, but argue that this Court should adopt a rule adopted in other circuits.   The Court declines.   In so doing, the Court rejects Webster's opinion that OSHA regulations do apply to Bollinger under the circumstances presented.

Instead, the Court concludes that the evidence does establish that Jones did confer with Ferez and arranged for the provision of the I-beam by Bollinger, Jones asked Ferez whether Ferez wanted a welder, and Ferez declined the offer of a welder because the I-beam was going to be moved during the Senner operations. The Court concludes that this meeting between Jones and Ferez satisfies any requirement that OSHA regulations suggest.   The Court further concludes that this claim also fails for lack of proof that, had a more formal safety meeting been convened to discuss the I-beam as suggested by plaintiffs, Ferez's decision against welding would not have prevailed.[7]

Finally, the plaintiffs' claims against Bollinger fail because, although the accident would not have occurred had the I-beam been welded into place, the I-beam was capable of being safely used without welding by Senner.   The

_____

[7]In addition, the evidence suggests that had Ferez asked that the I-beam be wedged as before, the accident would not have occurred.

combination of Ferez's failure to ensure that the I-beam was securely lodged into place and the lateral force attendant to the movement of the chain fall caused the accident, not the lack of a welding tack *per se*.  The Court concludes that Bollinger's duty of reasonable care did not extend as far as the plaintiffs argue and that Bollinger acted with reasonable care under the circumstances.  Everyone involved in the shipyard operations understood the parameters of the duties owed by Bollinger to Senner, including all of the Senner employees who testified that they alone were responsible for the safe use of the I-beam.

Instead, the Court finds that the gist of the plaintiffs' claims against both Blessey and Bollinger is that the vessel owner and shipyard should have supervised the Senner operations to ensure that Senner employees did not act in a manner in which they could harm themselves.   No case cited by the plaintiffs or uncovered in the Court's research extends the duty of the vessel owner or the shipyard this far, and the Court finds that the recognition of such a duty runs contrary to the underpinnings of *Scindia* and would virtually require the provision of a supervisor for every independent contractor in the yard.

The testimony of all involved with the decision to use the I-beam as a lifting point believed that it was absolutely safe.   This accident occurred after almost 20

successful lifts using the same I-beam.   It appears to the Court that both Ferez and

Aguilar still can not believe the accident happened.   But the mere fact that it

occurred on a vessel undergoing repairs in a shipyard does not render either the

vessel owner or the shipyard owner liable under the law, even if the accident could

have been avoided  had they undertaken the responsibilities to ensure the safety of

ship repairmen operations.   Instead, both defendants acted reasonably at all times

and breached no duty owed to Aguilar.

  Accordingly,

  IT IS ORDERED that judgment be entered against the plaintiffs and in favor

of the defendants, dismissing the plaintiffs' claims with prejudice.

  New Orleans, Louisiana, this 16th day of June, 2011.


        HELEN G. BERRIGAN
        UNITED STATES DISTRICT JUDGE